## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| **BEVERLY T. PETERS,**<br>   **individually and on behalf of all others**<br>   **similarly situated,** | |
| **PLAINTIFF** | **CASE NO.: _____** |
| **v.** | |
| **ST. JOSEPH SERVICES CORP. d/b/a**<br>   **ST. JOSEPH HEALTH SYSTEM and**<br> **ST. JOSEPH REGIONAL HEALTH**<br>   **CENTER,** | **JURY TRIAL DEMANDED** |
| **DEFENDANTS** | |

## CLASS ACTION COMPLAINT

Plaintiff Beverly T. Peters ("Peters" or "Plaintiff"), on behalf of herself and all others similarly situated, by and through her attorneys, brings this action against Defendants St. Joseph Services Corporation d/b/a St. Joseph Health System and St. Joseph Regional Health Center (together, "St. Joseph" or "Defendants"), and respectfully shows the following:

### NATURE OF THE CASE

1.      This is a consumer class action data breach lawsuit involving the unauthorized disclosure of personally identifiable information ("PII") and protected health information ("PHI") (together, "PII/PHI").  Plaintiff brings this action, individually and on behalf of approximately 405,000 similarly situated persons (*i.e.*, the Class Members), who entrusted their PII/PHI to St. Joseph in connection with securing health care services from St. Joseph based on St. Joseph's assurances that the proper data security measures, policies, procedures and protocols were in place and operational to safeguard and protect their PII/PHI.

2.      St. Joseph, however, willfully, intentionally, recklessly and/or negligently failed to safeguard and protect Plaintiff's and Class Members' PII/PHI, which was accessed, stolen and disseminated into the public domain by a thief or thieves from St. Joseph's inadequately protected computer system (the "Data Breach").   On information and belief, the stolen and compromised PII/PHI was unencrypted.   The St. Joseph Data Breach is one of the largest data breaches involving stolen and compromised PHI in the history of the United States.

3.      Plaintiff is a former St. Joseph patient.   The Class Members are current and former St. Joseph patients, employees and some employees' beneficiaries.   According to St. Joseph's February 4, 2014 press release revealing the Data Breach, the stolen and compromised PII/PHI include names, Social Security numbers, dates of birth, medical information (*i.e*., PHI), and possibly addresses.   The Data Breach also could involve other forms of Plaintiff's and Class Members' PII/PHI.   The investigation is ongoing.

4.      St. Joseph flagrantly disregarded Plaintiff's and Class Members' privacy rights by intentionally, willfully, recklessly and/or negligently failing to take the necessary precautions required to safeguard and protect their PII/PHI from unauthorized disclosure.   Plaintiff's and Class Members' PII/PHI was improperly handled and stored by St. Joseph, inadequately secured, on information and belief, unencrypted, and not kept in accordance with applicable, required, and appropriate cyber-security measures, policies, procedures and/or protocols.   As a result, Plaintiff's and Class Members' PII/PHI was stolen and compromised.

5.      By its wrongful actions, inaction and/or omissions and the resulting Data Breach, St. Joseph willfully and recklessly or, at the very least, negligently, violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").   St. Joseph failed to safeguard and protect Plaintiff's and Class Members' PII/PHI, which is specifically protected by FCRA, by failing to

limit its dissemination for permissible purposes authorized by FCRA.  As a direct and/or proximate result of St. Joseph willful, reckless and/or grossly negligent FCRA violations, unauthorized third parties, operating from IP addresses in China and elsewhere, obtained Plaintiff's and Class Members' PII/PHI for no permissible purpose under FCRA.

6.      St. Joseph's wrongful actions, inaction and/or omissions and the resulting Data Breach also violated the Texas Medical Practice Act, TEX. OCC. CODE § 159.001, *et seq.*, the Texas Hospital Licensing Law, TEX. HEALTH & SAFETY CODE § 241.001, *et seq.*, and the Texas Deceptive Trade Practices-Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41, *et seq*.

7.      St. Joseph's wrongful actions, inaction and/or omissions and the resulting Data Breach also constitute negligence/gross negligence, negligence *per se*, breach of contract, breach of implied contract, and money had and received/assumpsit under Texas common law.

8.      Plaintiff, on behalf of herself and the Class Members, seeks actual damages, consequential damages, statutory damages, nominal damages, exemplary damages, treble damages, injunctive relief, attorneys' fees, litigation expenses and/or costs of suit.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Plaintiff's FCRA claims pursuant to 28 U.S.C. § 1331 (federal question).  This Court also has subject matter jurisdiction over Plaintiff's Texas state law claims pursuant to 28 U.S.C. § 1367.  This Court has personal jurisdiction over St. Joseph because at all relevant times, St. Joseph's headquarters were (and continue to be) in the Southern District of Texas, and St. Joseph conducted (and continues to conduct) substantial business in the Southern District of Texas.

10.     Venue is proper in the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b) and (c), because at all relevant times, a substantial part, if not all, of the events giving

rise to this action occurred in the Southern District of Texas, and St. Joseph resides, is located, can be found, and conducts substantial business in the Southern District of Texas.

## PARTIES

11.     Plaintiff Peters is a citizen and resident of Brenham, Texas.  Peters is a former St. Joseph patient, who at all relevant times, purchased and received health care services from St. Joseph at several of its health care facilities.  Peters entrusted her PII/PHI to St. Joseph in connection with purchasing and receiving such health care services based on St. Joseph's assurances that the proper data security measures, policies, procedures and protocols were in place and operational to safeguard and protect her PII/PHI.   Peters' PII/PHI, however, was stolen and compromised in the Data Breach—as confirmed by the February 4, 2014 Data Breach notification letter she received from St. Joseph (Exhibit A).

12.     Peters has never been a victim of a data breach other than the St. Joseph Data Breach.  Peters meticulously protects her PII/PHI.  She utilizes different passwords for each of her online financial, credit card, and retail accounts, changing them on a regular basis.  Peters closely monitors her bank account, regularly checking it online at least every other day for irregular activity.  Peters also maintains her hard copy credit card and financial account statements in a safe for five years, after which she personally burns them in a trash barrel on her property.

13.     As a direct and/or proximate result of St. Joseph's wrongful actions, inaction and/or omissions and the resulting Data Breach, PII/PHI was accessed and utilized by one or more unauthorized third parties who inflicted identity theft, identity fraud and/or medical fraud on her in the form of, *inter alia*, attempted unauthorized charges on her Discover card.  Peters provided her Discover card account number to St. Joseph on forms she submitted to St. Joseph in

4

connection with purchasing health care services.  After the Data Breach, and while she was in Texas, Peters received a text from Discover requesting approval of an unauthorized, out of the ordinary retail purchase in Pennsylvania.   When Peters declined to approve the purchase, Discover immediately closed her account, and reissued a new payment card to her.

14.     As a direct and/or proximate result of St. Joseph's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the unauthorized access and utilization of her PII/PHI by one or more unauthorized third parties, Peters also suffered identity theft, identity fraud and/or medical fraud in the form of the breach of her Yahoo email account which, along with her Social Security number and Texas Driver's License number, was also submitted to St. Joseph in connection with purchasing health care services.  All of Peters' online financial, credit card, and retail accounts are linked to her Yahoo email account.  After the Data Breach, friends and relatives reported receiving large volumes of spam email from her Yahoo email account that they had never received before.  After the Data Breach, Peters also received a series of emails pertaining to a dispute between Amazon.com and an unidentified fraudster who accessed and utilized her Amazon.com account.  As a result of this fraudulent activity, Peters changed the password on her Yahoo email account.

15.     As a direct and/or proximate result of St. Joseph's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the unauthorized access and utilization of her PII/PHI by one or more unauthorized third parties, Peters also suffered identity theft, identity fraud and/or medical fraud in the form of online and mailed marketing materials specifically targeting her medical conditions about which the senders only could have learned by acquiring her stolen PHI from the data thieves.

16.     As a direct and/or proximate result of St. Joseph's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the resulting identity theft, identity fraud and/or medical fraud inflicted on her by one or more unauthorized third parties, Peters has suffered (and will continue to suffer) economic damages and other actual harm including, without limitation, (i) improper disclosure of her PII/PHI, (ii) statutory damages under FCRA, (iii) lost benefit of her bargain, (iv) deprivation of the value of her PII/PHI, for which there is a well-established national and international market, (v) diminished value of the medical services she paid St. Joseph to provide, (vi) value of her lost time and out-of-pocket expenses incurred to mitigate the identity theft, identity fraud and/or medical fraud pressed upon her (and/or to be pressed upon her) by the Data Breach (including, *inter alia*, the value of her lost time and out-of-pocket expenses that St. Joseph advised and encouraged her to incur to place "freezes" and "alerts" with the credit reporting agencies, close or modify financial accounts, and closely review and monitoring her credit reports and accounts for unauthorized activity), and (vii) emotional distress from the theft and compromise of her PII/PHI, the identity theft, identity fraud and medical fraud experienced to date, and the imminent prospect of future identity theft, identity fraud and medical fraud.

17.     Peters also is subject to a credible threat of real and impending future harm from further identity theft, identity fraud and/or medical fraud because her PII/PHI is available to, and actively being used by, fraudsters in the marketplace as evidenced by the identity theft, identity fraud and/or medical fraud she has experienced to date.  According to its 2012 Identity Fraud Report, Javelin Strategy & Research ("Javelin"), a leading provider of quantitative and qualitative da breach research, quantified the impact of data breaches, finding that individuals whose PII/PHI is subject to a reported data breach—such as the stolen and compromised PII/PHI

in the Data Breach at issue here—are approximately 9.5 times more likely than the general public to suffer identity theft, identity fraud and/or medical fraud.  According to its follow-up 2014 Identity Fraud Report, Javelin found that "[i]n 2013, one in three consumers who received notification of a data breach became a victim of fraud. This is up from one in four in 2012."[1]

18.    Also according to the 2012 Javelin Identity Fraud Report, in 2011, the mean consumer cost of rectifying identity fraud was $354 while the mean resolution time of identity fraud was 12 hours.  *Id.* at 6.    In 2011, the consumer cost for new account fraud and existing non-card fraud increased 33% and 50% respectively.  *Id.* at 9.   Consumers who received a data breach notification letter had a fraud incidence rate of 19% in 2011 and, of those experiencing fraud, 43% reported their credit card numbers were stolen, and 22% reported their debit card numbers were stolen.  *Id.* at 10.  Of those experiencing fraud, the average fraud-related economic loss was $1,513.  *Id.* at 6.

19.    Peters' increased risk of real and impending future harm and damages from identity theft, identity fraud and/or medical fraud would not exist but for St. Joseph's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the identity theft, identity fraud and/or medical fraud she has suffered to date.  Peters, therefore, has standing to bring this action.

20.    Defendant St. Joseph Services Corporation d/b/a St. Joseph Health System ("SJSC") is a Texas corporation with its principal place of business in Bryan, Texas.  SJSC is a health system originally established by the Sisters of St. Francis of Sylvania, Ohio, with facilities in eight Texas counties (Austin, Brazos, Burleson, Grimes, Lee, Leon, Madison, Robertson and Washington) serving more than 325,000 residents.  SJSC has five hospitals, two long term care

---

[1] *See* https://www.javelinstrategy.com/news/1467/92/A-New-Identity-Fraud-Victim-Every-Two-Seconds-in-2013-According-to-Latest-Javelin-Strategy-Research-Study/d,pressRoomDetail (last visited March 25, 2014).

centers, and over a dozen physician clinic locations.  SJSC may be served with Summons and a copy of this Class Action Complaint by serving its registered agent for service of process, Odette Bolano, 2801 Franciscan Drive, Bryan, Texas 77802-2544.

21.     Defendant St. Joseph Regional Health Center ("SJRHC") is a Texas corporation with its principal place of business in Bryan, Texas.  SJRHC owns and operates a 310-bed regional health care center in Bryan, Texas, the anchor facility for SJSC, as well as several other St. Joseph health care facilities.  Plaintiff purchased and received health care services from at least two of these St. Joseph facilities.  SJRHC may be served with Summons and a copy of this Class Action Complaint by serving its registered agent for service of process, Odette Bolano, 2801 Franciscan Drive, Bryan, Texas 77802-2544.

22.     SJSC and SJRHC together will be referred to as "St. Joseph."

23.     St. Joseph receives, evaluates, assembles, uses and/or discloses Plaintiff's and Class Members' PII/PHI in numerous ways, including, *inter alia*: (i) in connection with providing health care services to its patients, (ii) obtaining payment from insurance companies and state and federal government agencies, and via third-party collection agencies, (iii) for its own account in connection with its health care operations, including employment matters, and (iv) several other authorized purposes.  *See* St. Joseph Notice of Privacy Practices ("Privacy Notice") (Exhibit B).  In doing so, St. Joseph receives, evaluates, assembles, and transmits Plaintiff's and Class Members' PII/PHI to insurance companies, state and federal government agencies, and/or third-party collection agencies for purposes of, *inter alia*, determining whether Plaintiff and Class Members are eligible for various health care services, determining whether such health care services are covered by health insurance, and obtaining payment for such health care services.  The insurance companies, state and federal government agencies, and third-party

collection agencies, in turn, utilize Plaintiff's and Class Members' PII/PHI for a variety of purposes, including, *inter alia*, setting rates for health insurance, life insurance, and other types of insurance, setting rates for the payment of future health care services, evaluating insurance coverage issues and/or collecting for and/or paying St. Joseph for providing health care services.

## BACKGROUND FACTS

**I.      Data breaches lead to identity theft, identity fraud and/or medical fraud, and the resulting significant harm and economic damages.**

24.      According to the United States Government Accountability Office (GAO), the terms "identity theft" or "identity fraud" are broad terms encompassing various types of criminal activities, such as credit card fraud, phone or utilities fraud, bank fraud and government fraud (theft of government services).   Identity theft occurs when a person's PII/PHI is used without authorization to commit fraud or other crimes. *See* Federal Trade Commission, Fighting Back against Identity Theft.[2]  According to the FTC:

> Identity theft is serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

*Id.*

25.      Also according to the FTC, "the range of privacy-related harms is more expansive than economic or physical harm or unwarranted intrusions and that any privacy framework should recognize additional harms that might arise from unanticipated uses of data."[3] Furthermore, "there is significant evidence demonstrating that technological advances and the

---

[2]   *See*  http://www.ftc.gov/bcp/edu/microsites/idtheft/consumers/about-identity-theft.html   (last   visited March 27, 2014).

[3] *Protecting Consumer Privacy in an Era of Rapid Change*, FTC Report (March 2012).

ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[4]

26.     Moreover, "[o]nce identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance. An identity thief can file a tax refund in your name and get your refund. In some extreme cases, a thief might even give your name to the police during an arrest."[5]

27.     Medical fraud (also known as medical identity theft) occurs when a person's personal information is used without authorization to obtain, or receive payment for, medical treatment, services or goods.[6]  For example, as of 2010, more than 50 million people in the United States did not have health insurance according to the U.S. census. This, in turn has led to a surge in medical identity theft as a means of fraudulently obtaining medical care. "Victims of medical identity theft [also] may find that their medical records are inaccurate, which can have a serious impact on their ability to obtain proper medical care and insurance benefits." *Id.*[7]

28.     Theft of medical information, such as that included in the Data Breach here, is also gravely serious; to wit, "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the

---

[4] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers*, *Preliminary FTC Staff Report*, 35-38 (Dec. 2010), *available at* http://www.ftc.gov/os/2010/12/101201privacyreport.pdf; *Comment of Center for Democracy & Technology*, cmt. #00469, at 3; *Comment of Statz, Inc.*, cmt. #00377, at 11-12 (last visited March 29, 2014).

[5] *See* Federal Trade Commission, *Signs of Identity Theft*, http://www.consumer.ftc.gov/articles/0271-signs-identity-theft (last visited March 27, 2014).

[6] *See* www.ftc.gov/bcp/edu/microsites/idtheft/consumers/resolving-specific-id-theft-problems.html (last visited March 24, 2014).

[7] *See* www.ftc.gov/bcp/edu/microsites/idtheft/consumers/resolving-specific-id-theft-problems.html (last visited March 27, 2014).

thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[8]

29.     A fraudster can easily research the email address of a data breach victim.  When a fraudster has access to PII/PHI from a large group of similarly situated victims, it is much more feasible to develop a believable phishing[9] spoof email that appears realistic. The fraudsters can then convince the group of victims to reveal  additional private financial account and payment card information.

30.     PII/PHI is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[10]   Identity thieves and other cyber criminals openly post stolen credit card numbers, Social Security numbers and other PII/PHI directly on various Internet websites, thereby making the information publicly available.  In one study, researchers found hundreds of websites displaying stolen PII/PHI.  Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism—the "Safe Browsing list."  The study concluded:

---

[8] *See* Federal Trade Commission, *Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited March 27, 2014).

[9] "Phishing" is an attempt to acquire information (and sometimes, indirectly, money), such as usernames, passwords and credit card details by masquerading as a trustworthy entity through an electronic communication.  Communications purporting to be from popular social websites, auction sites, online payment processors or IT administrators are commonly used to lure the unsuspecting public.  Phishing emails may contain links to websites that are infected with malware.  Phishing is typically carried out by e-mail spoofing or instant messaging, and often directs users to enter details at a fake website that looks and feels almost identical to the legitimate one.

[10] Companies, in fact, also recognize PII/PHI  as an extremely valuable commodity akin to a form of personal property.  For example, Symantec Corporation's Norton brand created a software application that values a person's identity on the black market. Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html; *see also* T. Soma, *et al*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009).

It is clear from the current state of the credit card black-market that cyber criminals can operate much too easily on the Internet. They are not afraid to put out their email addresses, in some cases phone numbers and other credentials in their advertisements. It seems that the black market for cyber criminals is not underground at all. In fact, it's very "in your face."[11]

31.     "[H]ealth information is far more valuable than Social Security numbers" on the cyber black market according to Dr. Deborah Peel, founder and chairwoman of Patient Privacy Rights.[12]  An ABC News search uncovered one internet seller offering medical record database dumps for $14 to $25 per person.  ABC News was then sent, unsolicited, 40 individuals' private health information, including their names, addresses and body mass index.  Another inquiry yielded an offer of more than 100 records including everything from Social Security numbers to whether someone suffered from anxiety, hypertension, and their HIV status.  Plaintiff's and Class Members' PII/PHI could similarly be valued and traded on the cyber black market—and, on information and belief, probably have been.  Medical records generally "hold an average black market value of $50 per record."[13]

32.     The GAO found that identity thieves use PII/PHI to open financial and payment card accounts, and incur charges in a victim's name.  This type of identity theft is the "most damaging" because it may take some time for the victim to become aware of the theft—in the meantime causing significant harm to the victim's credit rating and finances.  Moreover, unlike other PII/PHI, Social Security numbers are incredibly difficult to change and their misuse can continue for years into the future.

---

[11] *See*  http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket  (last visited March 27, 2014).

[12] *See* http://abcnews.go.com/Health/medical-records-private-abc-news-investigation/story?id =17228986 &page=2#.UGRgtq7yBR4 (last visited March 27, 2014).

[13] Pamela Louis Dolan, "Health Data Breaches Usually Aren't Accidents Anymore," (July 29, 2013), available at http://www.amednews.com/article/20130729/business/130729953/4/ (last visited March 27, 2014).

33.     Identity thieves also use Social Security numbers to commit other types of fraud, such as obtaining false identification cards, obtaining government benefits in the victim's name, committing crimes and/or filing fraudulent tax returns on the victim's behalf to obtain fraudulent tax refunds.  Identity thieves also obtain jobs using stolen Social Security numbers, rent houses and apartments and/or obtain medical services in the victim's name.  Identity thieves also have been known to give a victim's personal information to police during an arrest, resulting in the issuance of an arrest warrant in the victim's name and an unwarranted criminal record.  The GAO states that victims of identity theft face "substantial costs and inconvenience repairing damage to their credit records," as well the damage to their "good name."

34.      The unauthorized disclosure of a person's Social Security number can be particularly damaging since Social Security numbers cannot be easily replaced like a credit card or debit card.  In order to obtain a new Social Security number, a person must show evidence that someone is using the number fraudulently or is being disadvantaged by the misuse.[14]  Thus, a person whose PII/PHI has been stolen cannot obtain a new Social Security number until the damage has already been done.

35.     Obtaining a new Social Security number also is not an absolute prevention against identity theft and identity fraud. Government agencies, private businesses and credit reporting companies likely still have the person's records under the old number, so using a new number will not guarantee a fresh start.  For some victims of identity theft and identity fraud, a new number may actually create new problems. Because prior positive credit information is not associated with the new Social Security number, it is more difficult to obtain credit due to the

---

[14] *See* Identity Theft and Your Social Security Number, SSA Publication No. 05-10064, October 2007, ICN 46327 (http://www.ssa.gov/pubs/10064.html).

absence of a credit history.  Data breaches, therefore, lead to identity theft, identity fraud and/or medical fraud, and the resulting significant harm and economic damages.

## II.   The Privacy Notice—St. Joseph's Contractual Privacy Obligations to its Patients.

36.   As a condition to providing health care services, St. Joseph requires its patients to provide their detailed PII/PHI.  Indeed, St. Joseph recognizes that maintaining the confidentiality of its patients' PII/PHI is critical:

> Safeguarding patients' health information is *not only a legal requirement but also an important ethical obligation.* As a health care provider, St. Joseph and its staff are entrusted with clinical information regarding our patients. *We recognize that medical and billing records are highly confidential and must be treated with great respect and care* by all staff with access to this information. St. Joseph's policy regarding confidentiality of protected health care information reflects *our strong commitment to protecting the confidentiality of our patients' medical records and clinical information.*[15]

(emphasis added).

37.   St. Joseph also makes certain representations, warranties and commitments to its patients regarding the privacy of their PII/PHI in its Privacy Notice (Exhibit B).  The Privacy Notice is posted in each St. Joseph facility (*id.* at 1) and on the St. Joseph website.[16]  The Privacy Notice is also given to every St. Joseph patient—including Plaintiff and Class Members.  Indeed, each St. Joseph patient must sign the Privacy Notice, acknowledging its existence and terms as a condition to receiving health care services.  *Id.* at 3.  Plaintiff signed the Privacy Notice.

38.   St. Joseph itemizes its privacy obligations to its patients in the Privacy Notice, making a firm commitment to uphold them; to wit, "St. Joseph is required by law[17] to maintain

---

[15] See http://www.st-joseph.org/body.cfm?id=461 (last visited March 25, 2014).

[16] *See* http://www.st-joseph.org/workfiles/privacy.pdf (last visited March 22, 2014).

[17] *See, e.g.*, Health Insurance Portability and Accountability Act of 1996, as amended, 42 U.S.C. § 1320d, *et seq.* ("HIPAA"), Texas Medical Records Privacy Act, TEX. HEALTH & SAFETY CODE § 181.001, *et*

the privacy of health information about you that can identify you ('Protected Health Information' or 'PHI'), to provide you with this Notice of our legal duties and privacy practices with respect to your PHI, and to abide by the terms of the Notice currently in effect." *Id*. at 1.

39.     St. Joseph further pledges:

*We understand that all information about you and your health is personal. We are committed to protecting this information.* When you receive services at a St. Joseph Facility/Entity, a medical record is created. This record describes the services provided to you and is needed to provide you with quality care and to comply with certain legal requirements. This Notice applies to records of your care generated by St. Joseph, whether made by a St. Joseph employee or a physician involved in your care.

*Id*. at 1 (emphasis added).

40.     The Privacy Notice lists the following specific and limited permissible purposes for which St. Joseph may use and disclose all or a portion of its patients' PII/PHI without their authorization:

(i)     Treatment, payment and health care operations;

(ii)    Sharing with other organizations in connection with treatment, payment and health care operations;

(iii)   Inclusion in a specific St. Joseph facility patient directory;

(iv)    Disclosure to relatives and close friends to the extent necessary to assist with a patient's health care or to secure payment for the patient's health care;

(v)     Disclosure for purpose of assisting disaster relief efforts;

(vi)    Medical research in limited situations;

(vii)   Fundraising activities; and

(viii)  Disclosures required by law, such as pertaining to various listed public health activities.

*Id*. at 1-2.

---

*seq*., Texas Medical Practice Act, Tex. Occ. Code § 159.001, *et seq*., Texas Hospital Licensing Law, Tex. Health & Safety Code § 241.001, *et seq*., and Tex. Bus. & Com. Code §§ 521.052; 521.053.

41.     "*For any purpose other than the ones described above, your PHI may be used or disclosed only when you provide your written authorization on an approved authorization form.*" Privacy Notice at 2 (emphasis added).  In other words, St. Joseph commits that "*for any purpose other than the ones described above,*" a patient's PII/PHI will not be disclosed without authorization.  *Id*.  There are no exceptions.

42.     Regarding its patients' rights pertaining to their PHI, St. Joseph further represents and promises that "[i]n certain [undefined] instances, you have the right to be notified in the event that we, or one of our Business Associates, discover an inappropriate use or disclosure of your health information. Notice of any such use or disclosure will be made in accordance with state and federal requirements."  Privacy Notice at 3.

43.     St. Joseph further represents and promises its patients that they also "have the right to request an 'accounting of disclosures.' This is a list of disclosures that we have made about you." *Id*.

44.     Finally, regarding the PII/PHI entrusted to it, St. Joseph represents and promises that it "safeguards customer information using various tools such as firewalls, passwords and data encryption" and "continually strive[s] to improve these tools to meet or exceed industry standards." *Id*.  Ironically, St. Joseph also promises to "limit access to [its patients'] information to protect against its unauthorized use." *Id*.  St. Joseph's data security efforts, however, unfortunately failed across the board.

## III.    The St. Joseph Data Breach.

45.     On February 4, 2014, St. Joseph announced to the public, for the first time, that between December 16, 2013 and December 18, 2013, a server on its computer system storing

patient and employee files for several St. Joseph facilities (*i.e.*, their PII/PHI) granted unauthorized access to parties operating from IP addresses in China and elsewhere.

46.     The infiltrated server contained the PII/PHI of Plaintiff and approximately 405,000 Class Members, which was stolen, compromised and disseminated into the public domain (the "Data Breach").   The stolen and compromised PII/PHI included names, Social Security numbers, dates of birth, and addresses.   For affected patients, medical information was also accessed.   For some of the affected employees, bank account information was also accessed. Other information may also have been stolen, the investigation is ongoing.   On information and belief, none of the stolen and compromised PII/PHI was encrypted.   The Data Breach is one of the largest medical data breaches in the history of the United States.

47.     In an attempt to guard against another future data breach, St. Joseph also announced it was "taking appropriate additional security measures to strengthen the security of its system," (*id.*), which are the PII/PHI data security measures, policies, procedures, protocols, and software and hardware systems it should have previously instituted.   Had such PII/PHI data security measures, policies, procedures, protocols, and software and hardware systems already been in place, functioning and properly monitored, the Data Breach never would have occurred. On information and belief, at the time of the Data Breach, St. Joseph was not compliant with HIPAA, the Texas Medical Records Privacy Act, the Texas Medical Practice Act, Texas Hospital Licensing Law, Section 521.052 of the Texas Business and Commerce Code, and/or other applicable industry standards and/or PII/PHI data security standards.

48.     What's more, despite knowing about the Data Breach since at least December 18, 2013, St. Joseph did not announce the Data Breach and/or commence sending Data Breach notification letters to Plaintiff and Class Members until February 4, 2014—almost seven weeks

after the Data Breach.  Had Plaintiff and Class Members known about the Data Breach sooner, they could have taken certain defensive measures much earlier—such as changing financial account and payment card passwords and email addresses—to mitigate their injuries and damages.  St. Joseph's Data Breach notification delay, therefore, also substantially increased the risk of additional real and impending future harm and damages to Plaintiff and Class Members from identity theft, identity fraud and/or medical fraud.

49.     During the intervening period between the Data Breach and the date the Data Breach notification letters were sent to Plaintiff and Class Members, their unencrypted PII/PHI, on information and belief, was bought and sold several times on the robust international cyber black market—as evidenced by the identity theft, identity fraud and/or medical fraud Plaintiff has already suffered—while they had no chance whatsoever to take measures to protect the its confidentiality.

50.     St. Joseph's Data Breach notification letters were a weak attempt to "lock the barn door after the horse got out."  Rather than getting out in front of the Data Breach and offering Plaintiff and Class Members real protection for their now stolen and compromised PII/PHI, St. Joseph lamely offered Plaintiff and Class Members one year of credit monitoring through AllClear ID (Exhibit A)—even though it is well known that data thieves routinely use stolen PII/PHI for longer than a year, and sometimes wait more than a year to use the stolen information until the conclusion of one year credit monitoring programs that breached organizations typically offer.  Even then, a mere one year of credit monitoring is woefully insufficient band-aid given the trove of unencrypted PII/PHI stolen and disseminated to the world, and the manipulation and machinations of cyber criminals.

51.     In truth, the actual post-Data Breach "PII/PHI protection services" AllClear ID supposedly will provide, if any, and at what price are remarkable indiscernible—which could be a violation of the Texas Deceptive Trade Practices-Consumer Protection Act in itself.  At best, the proffered credit monitoring indirectly tracks identity theft; while it may reveal new credit accounts opened with the stolen information, it will do nothing to monitor unauthorized charges made to, for example, existing payment card accounts.  After data breach victims enroll in this type of program, companies such as AllClear ID and the credit reporting agencies typically treat their enrollment as golden opportunities to push other unnecessary products and services—thereby further damaging Plaintiff and Class Members.

52.     Notwithstanding St. Joseph's promises, AllClear ID and its "PII/PHI protection services," in truth, are significantly less than advertised.  In the fine print in its Terms of Use attached to the St. Joseph Data Breach notification letters (Exhibit B), AllClear ID states it (i) "will not make payments or reimbursements to you for any loss or liability you may incur," and (ii) "does not promise to help you improve your credit history or rating beyond resolving incidents of fraud."  As a further condition of receiving AllClear ID "protection services," Plaintiff and Class Members must not fall victim to phishing emails and disclose their PII that could result from the Data Breach.  In other words, if a Class Member is victimized by a phishing scam resulting from the St. Joseph Data Breach, he or she will lose the AllClear ID "protection services" offered as a result of the Data Breach.  This is madness.

53.     St. Joseph's Data Breach notification letters also are a less-than-subtle attempt to shift the burden and expense of the Data Breach to Plaintiff and Class Members by, *inter alia*, advising and encouraging them to incur the time and expense to (i) regularly purchase their credit reports from the three major credit reporting agencies, (ii) contact the agencies, law

enforcement, state attorney general and/or the FTC if anything in their financial or retail accounts look amiss, (iii) place fraud alerts on their credit reports, and (iv) place and/or lift freezes on their credit files, which must be instituted at each credit reporting agency (*i.e.*, Equifax, Experian, and TransUnion) at a cost of $5 to $20 an action.  All of these actions will take time and money to effectuate—which St. Joseph has advised and encouraged Plaintiff and Class Members to incur, but not offered to pay.

**IV.**   **The St. Joseph Data Breach Inflicted Serious Harm and Economic Damages on Plaintiff and Class Members.**

54.   St. Joseph's above-described wrongful actions, inaction and/or omissions—to wit, failing to protect Plaintiff's and Class Members' PII/PHI with which it was entrusted—directly and/or proximately caused the Data Breach, theft and dissemination into the public domain of Plaintiff's and Class Members' unencrypted PII/PHI without their knowledge, authorization, and/or consent.

55.   St. Joseph flagrantly and/or negligently disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by not obtaining Plaintiffs' and Class Members' prior written consent to disclose their PII/PHI to any other person or organization and/or for any purpose other than the persons, organizations and purposes listed in the Privacy Notice—as required by, *inter alia*, the Privacy Notice, FCRA, HIPAA, the Texas Medical Records Privacy Act, the Texas Medical Practice Act, Texas Hospital Licensing Law, Section 521.052 of the Texas Business and Commerce Code, and/or other pertinent laws, regulations, industry standards and/or internal standards in effect at the time of the Data Breach.

56.   St. Joseph flagrantly and/or negligently disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by failing to identify, implement, maintain and/or monitor appropriate data security measures, policies, procedures,

protocols, and software and hardware systems to ensure the security and confidentiality of Plaintiff's and Class Members' PII/PHI.  St. Joseph's unwillingness or inability to identify, implement, maintain and/or monitor such data security measures, policies procedures, protocols, and software and hardware system—while, at the same time, claiming in the Privacy Notice such "tools" were in place (*id.* at 3)—is an abuse of discretion, and confirms St. Joseph's intentional and willful conduct.

57.     St. Joseph's untimely and inadequate Data Breach notification—including St. Joseph's failure to provide Plaintiff and Class Members with any meaningful protection or relief from the Data Breach—is misleading and, even worse, substantially increased Plaintiff's and Class Members' risk of real and impending future harm and damages from identity theft, identity fraud and/or medical fraud.

58.     St. Joseph flagrantly and/or negligently disregarded and/or violated Plaintiff's and Class Members' privacy rights, and harmed them in the process, by depriving Plaintiff and Class Members of the value of their PII/PHI, for which there is a well-established national and international market.  *See, e.g., See, e.g.,* John T. Soma, J. Zachary Courson, John Cadkin, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted); ABC News Report.[18]

59.     Personal Information is a valuable commodity. A "cyber black market" exists in which criminals openly post stolen credit card numbers, Social Security numbers, and other PII/PHI on a number of Internet websites.  Once a data breach victim's PII/PHI is stolen,

---

[18]         *See*              http://abcnews.go.com/Health/medical-records-private-abc-news-investigation/story?id=17228986&page=2#.UGRgtq7yBR4 (last visited March 24, 2014).

disseminated, and traded as a commodity in the cyber black market—such as Plaintiff's and Class Members' stolen PII/PHI—their ability to monetize their PII/PHI, as well as the value at which it can be monetized, is substantially diminished or lost because, again, the "horse is already out of the barn."  It is the law of supply and demand.

60.     In addition to fraudsters, frequent purchasers of purloined PHI on the cyber black market include legitimate pharmacies, drug manufacturers, medical device manufacturers, and hospitals, which use the stolen information to target market their products and services directly to data breach victims.  Insurance companies purchase and use stolen PHI to adjust their insureds' medical insurance premiums.  *Id*.

61.     Plaintiff and Class Members—not data thieves—should have exclusive right to monetize their PII/PHI at the highest values possible.  St. Joseph's above-described wrongful actions, inaction and/or omissions and the resulting Data Breach robbed them of these rights.

62.     As a direct and/or proximate result of St. Joseph's above-described wrongful actions, inaction and/or omissions and the resulting Data Breach, Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other actual harm including, without limitation, the (i) improper disclosure of their PII/PHI, (ii) statutory damages under FCRA, (iii) lost benefit of their bargains, (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, (v) diminished value of the medical services they paid St. Joseph to provide, (vi) value of their lost time and out-of-pocket expenses incurred to mitigate the identity theft, identity fraud and/or medical fraud pressed upon them (and/or to be pressed upon them) by the Data Breach (including, *inter alia*, the value of their lost time and out-of-pocket expenses that St. Joseph advised and encouraged them to incur to place "freezes" and "alerts" with the credit reporting agencies, close or modify financial accounts, and

closely review and monitoring their credit reports and accounts for unauthorized activity), (vii) emotional distress from the theft and compromise of their PII/PHI, the identity theft, identity fraud and/or medical fraud experienced to date and to be experienced in the future, and (viii) the credible threat of real and impending future harm and damages from identity theft, identity fraud and/or medical fraud, as evidenced by the identity theft, identity fraud and/or medical fraud Plaintiff has already experienced—for which they are entitled to compensation.

## CLASS ACTION ALLEGATIONS

63.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action as a class action on behalf of herself and the following Class of similarly situated individuals:

> All Texas residents who were sent a letter or other communication by St. Joseph notifying them that their personally identifiable information and/or protected health information was maintained on a St. Joseph Health System computer system server that was breached by hackers between December 16, 2013 and December 18, 2013, inclusive.

Excluded from the Class are (i) St. Joseph officers and directors, and (ii) the Court, Court personnel, and members of their immediate families.

64.     The Class Members are so numerous that their joinder is impracticable. According to information provided by St. Joseph, there are over 400,000 Class Members.  The precise identities of the Class Members and their addresses are currently unknown to Plaintiff, but can be easily derived from St. Joseph's internal records that were used to send the Data Breach notification letters to Plaintiff and Class Members in early February 2014.

65.     St. Joseph's above-described wrongful actions, inaction and/or omissions that caused the Data Breach and the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI violated the rights of Plaintiff and each Class Member in a virtually identical manner.

66.     Questions of law and fact common to all Class Members predominate over any questions affecting only individual Class Members including, *inter alia*:

(i)     Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI willfully or negligently violated FCRA;

(ii)    Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI violated the Texas Medical Practice Act;

(iii)   Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI violated the Texas Hospital Licensing Law;

(iv)    Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI constitutes negligence and/or gross negligence;

(v)     Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI constitutes negligence *per se*;

(vi)    Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI constitutes breach of contract;

(vii)   Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI constitutes breach of implied contract;

(viii)  Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI violated the Texas Deceptive Trade Practices-Consumer Protection Act;

(ix)    Whether St. Joseph's failure to safeguard and protect Plaintiff's and Class Members' PII/PHI invokes the equitable doctrines of money had and received/assumpsit;

(x)     Whether Plaintiff and Class Members sustained harm and damages as a direct and/or proximate result of St. Joseph's failure to safeguard and protect their PII/PHI and, if so, the amount of such damages;

(xi)    Whether Plaintiff and Class Members are entitled to exemplary damages as a direct and/or proximate result of St. Joseph's failure to safeguard and protect their PII/PHI and, if so, the amount of such damages; and

(xii)   Whether Plaintiff and Class Members are entitled to injunctive relief as a direct and/or proximate result of St. Joseph's failure to safeguard and protect their PII/PHI.

67.    Plaintiff's claims are typical of the Class Members' claims because Plaintiff, like all Class Members, is a victim of St. Joseph's above-described wrongful actions, inaction and/or omissions that caused the Data Breach, caused the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI, and caused Plaintiff and Class Members to suffer the resulting harm and damages.

68.    Plaintiff and her counsel will fairly and adequately represent the Class Members' interests.  Plaintiff has no interests antagonistic to, or in conflict with, Class Members' interests. Plaintiff's attorneys are highly experienced in the prosecution of consumer class actions and data breach class actions, and intend to vigorously prosecute this action on behalf of Plaintiff and Class Members as they have to date.

69.    A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiff's and Class Members' claims.  Plaintiff and Class Members have been irreparably harmed as a result of St. Joseph's wrongful actions, inaction and/or omissions and the resulting Data Breach.  Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Class Members to intervene as parties-plaintiff in this action, (iii) it will allow numerous individuals with claims too small to adjudicate on an individual basis because of prohibitive litigation costs to obtain redress for their injuries, and (iv) it will provide Court oversight of the claims process once St. Joseph's liability is adjudicated.

70.    Class certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

71.     Class certification also is appropriate under FED. R. CIV. P. 23(b)(2) because St. Joseph has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I

### WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (15 U.S.C. § 1681, *et seq.*)

72.     The preceding factual statements and allegations are incorporated by reference

73.     In enacting FCRA, Congress made several findings, including that consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit information and other consumer information—such as PII/PHI (15 U.S.C. § 1681(a)(3))—and "*[t]here is a need to insure* that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and *a respect for the consumer's right to privacy*." 15 U.S.C. § 1681(a)(4) (emphasis added).

74.     Under 15 U.S.C. § 1681a(f), a "consumer reporting agency" includes any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages, in whole or in part, in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

75.     Under 15 U.S.C. § 1681a(d)(1), a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in

26

part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other purpose authorized under 15 U.S.C. § 1681b.

76.    "Consumer credit information" (PII) includes, *inter alia*, a person's name, identification number (*e.g.*, Social Security number), marital status, physical address and contact information, educational background, employment, professional or business history, financial accounts and financial account history (*i.e.*, details of the management of the accounts), credit report inquiries (*i.e.*, whenever consumer credit information is requested from a credit reporting agency), judgments, administration orders, defaults, and other notices.

77.    Under 15 U.S.C. § 1681a(i), "medical information" (PHI) is information or data, whether oral or recorded, in any form or medium, created by or derived from a health care provider or the consumer, that relates to the (i) past, present, or future physical, mental, or behavioral health or condition of an individual, (ii) provision of health care to an individual, and (iii) payment for the provision of health care to an individual.

78.    FCRA limits the dissemination of consumer credit information (PII) to certain well-defined circumstances and no other.  15 U.S.C. § 1681b(a).  FCRA also specifically protects medical information (PHI).  *See, e.g.,* 15 U.S.C. §§ 1681a(d)(3) ("Restriction on sharing of medical information"); 1681b(g) ("protection of medical information"); 1681c(a)(6) ("Information excluded from consumer reports").

79.    At all relevant times, Plaintiff and Class Members were consumers of health care services from St. Joseph and its employed and/or affiliated health care professionals.  As such, Plaintiff's and Class Members' PII/PHI, which was delivered to St. Joseph in connection with securing such health care services based on St. Joseph's commitment to safeguard and protect it,

27

in whole or in part, is consumer credit information and/or medical information protected by FCRA.

80.     At all relevant times, St. Joseph was (and continues to be) a consumer reporting agency under FCRA because on a cooperative nonprofit basis and/or for monetary fees, St. Joseph regularly (i) received, assembled and/or evaluated Plaintiff's and Class Members' consumer credit information and/or medical information protected by FCRA (*i.e.*, their PII/PHI) for the purpose of furnishing consumer reports to third parties, and (ii) used the means and/or facilities of interstate commerce to prepare, furnish and transmit consumer reports containing Plaintiff's and Class Members' PII/PHI to third parties—for the ultimate purposes of, *inter alia*, establishing Plaintiff's and Class Members' eligibility for health care services, confirming whether such health care services were covered by their health insurance and/or securing payment for the provision of such health care services.

81.     As a consumer reporting agency, St. Joseph was (and continues to be) required to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard, protect and limit the dissemination of consumer credit information and medical information in its possession, custody and control, including Plaintiff's and Class Members' PII/PHI, only for permissible purposes under FCRA.  *See* 15 U.S.C. § 1681(b).

82.     By its above-described wrongful actions, inaction and/or omissions, however, St. Joseph willfully and/or recklessly violated FCRA; to wit, St. Joseph willfully and/or recklessly violated 15 U.S.C. § 1681(b), 15 U.S.C. § 1681a(d)(3), 15 U.S.C. § 1681b(a);(g), and/or 15 U.S.C. § 1681c(a)(6) (and the related applicable regulations) by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and

software and hardware systems to safeguard and protect Plaintiff's and Class Members' PII/PHI which, in turn, directly and/or proximately caused the Data Breach which, in turn, directly and/or proximately resulted in the theft of Plaintiff's and Class Members' unencrypted PII/PHI and its wrongful dissemination into the public domain for no permissible purpose under FCRA.  St. Joseph's above-described willful and reckless FCRA violations also prevented it from being in a position to timely and immediately notify Plaintiff and Class Members about the Data Breach which, in turn, inflicted additional harm and economic damages on them.

83.     As a direct and/or proximate result of St. Joseph's above-described willful and/or reckless violations of FCRA and the resulting Data Breach, Plaintiff and Class Members are entitled to compensation for the economic damages and other actual harm inflicted on them by St.  Joseph, including, *inter alia*, the (i) improper disclosure of their PII/PHI, (ii) lost benefit of their bargains, (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, (iv) diminished value of the medical services they paid St. Joseph to provide, (v) value of their lost time and out-of-pocket expenses incurred to mitigate the identity theft, identity fraud and/or medical fraud pressed upon them (and/or to be pressed upon them) by the Data Breach (including, *inter alia*, the value of their lost time and out-of-pocket expenses that St. Joseph advised and encouraged them to incur to place "freezes" and "alerts" with the credit reporting agencies, close or modify financial accounts, and closely review and monitoring their credit reports and accounts for unauthorized activity), (vi) emotional distress from the theft and compromise of their PII/PHI, the identity theft, identity fraud and/or medical fraud experienced to date and to be experienced in the future, (vii) the credible threat of real and impending future harm and damages from identity theft, identity fraud and/or medical fraud, as evidenced by the identity theft, identity fraud and/or medical fraud Plaintiff has already

experienced, and (viii) statutory damages of not less than $100, and not more than $1000, each, as well as attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. §1681n(a).

## COUNT II

### NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT (15 U.S.C. § 1681, *et seq.*)

84.     The preceding factual statements and allegations are incorporated by reference.

85.     In the alternative, by its above-described wrongful actions, inaction and/or omissions, St. Joseph negligently and/or in a grossly negligent manner violated FCRA; to wit, St. Joseph negligently and/or in a grossly negligent manner violated 15 U.S.C. § 1681(b), 15 U.S.C. § 1681a(d)(3), 15 U.S.C. § 1681b(a);(g), and/or 15 U.S.C. § 1681c(a)(6) (and the related applicable regulations) by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' PII/PHI which, in turn, directly and/or proximately caused the Data Breach which, in turn, directly and/or proximately resulted in the theft of Plaintiff's and Class Members' unencrypted PII/PHI and its wrongful dissemination into the public domain for no permissible purpose under FCRA.  St. Joseph's above-described negligent and/or grossly negligent FCRA violations also prevented it from being in a position to timely and immediately notify Plaintiff and Class Members about the Data Breach which, in turn, inflicted additional harm and damages on them.

86.     It was reasonably foreseeable to St. Joseph that its failure to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' PII/PHI would result in a data breach whereby an unauthorized third party would gain access to, and

disseminate, Plaintiff's and Class Members' PII/PHI into the public domain for no permissible purpose under FCRA.

87.     Plaintiff and Class Members, therefore, are entitled to compensation for their actual damages including, *inter alia*, the (i) improper disclosure of their PII/PHI, (ii) lost benefit of their bargains, (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, (iv) diminished value of the medical services they paid St. Joseph to provide, (v) value of their lost time and out-of-pocket expenses incurred to mitigate the identity theft, identity fraud and/or medical fraud pressed upon them (and/or to be pressed upon them) by the Data Breach (including, *inter alia*, the value of their lost time and out-of-pocket expenses that St. Joseph advised and encouraged them to incur to place "freezes" and "alerts" with the credit reporting agencies, close or modify financial accounts, and closely review and monitoring their credit reports and accounts for unauthorized activity), (vi) emotional distress from the theft and compromise of their PII/PHI, the identity theft, identity fraud and/or medical fraud experienced to date and to be experienced in the future, and (vii) the credible threat of real and impending future harm and damages from identity theft, identity fraud and/or medical fraud, as evidenced by the identity theft, identity fraud and/or medical fraud Plaintiff has already experienced, and (viii) attorneys' fees, litigation expenses and costs, pursuant to 15 U.S.C. §1681o(a).

## COUNT III

### VIOLATION OF THE TEXAS MEDICAL PRACTICE ACT
### (TEX. OCC. CODE § 159.001, *et seq.*)

88.     The previous factual statements and allegations are incorporated by reference.

89.     Under TEX. OCC. CODE § 159.002(a);(b), communications between a physician and a patient, relative to or in connection with any professional services as a physician to the

patient, including records of the identity, diagnosis, evaluation, or treatment of a patient by a physician that is created or maintained by a physician, are confidential and privileged.

90.     Under TEX. OCC. CODE § 159.002(c), a person, including a hospital, that receives information from a confidential communication or record as described above and acts on the patient's behalf, may not disclose such information except to the extent that disclosure is consistent with the authorized purposes for which the information was first obtained.

91.     St. Joseph's above-described wrongful actions, inaction and/or omissions that caused the Data Breach, caused the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI, and caused Plaintiff and Class Members to suffer the resulting harm and damages collectively constitute the unauthorized release of confidential and privileged communications in violation of the Texas Medical Practice Act.  Plaintiff and Class Members, therefore, are entitled to injunctive relief and/or to recover their damages under TEX. OCC. CODE § 159.009.

## COUNT IV

### VIOLATION OF THE TEXAS HOSPITAL LICENSING LAW
### (TEX. HEALTH & SAFETY CODE § 241.001, *et seq.*)

92.     The previous factual statements and allegations are incorporated by reference.

93.     Under TEX. HEALTH & SAFETY CODE § 241.151(2), "health care information" is any information, including payment information, recorded in any form or medium that identifies a patient and relates to the history, diagnosis, treatment, or prognosis of a patient.

94.     Under TEX. HEALTH & SAFETY CODE § 241.152(a), except as authorized by TEX. HEALTH & SAFETY CODE § 241.153 (which does not apply here), a hospital or an agent or employee of a hospital may not disclose health care information about a patient to any person other than the patient or the patient's legally authorized representative without the written authorization of the patient or the patient's legally authorized representative.

95.     Under TEX. HEALTH & SAFETY CODE § 241.155, a hospital shall adopt and implement reasonable safeguards for the security of all health care information it maintains.

96.     St. Joseph's above-described wrongful actions, inaction and/or omissions that caused the Data Breach, caused the unauthorized disclosure of Plaintiff's and Class Members' PII/PHI, and caused Plaintiff and Class Members to suffer the resulting harm and damages collectively constitute (i) the unauthorized disclosure of Plaintiff's and Class Members' health care information to unauthorized parties, and (ii) St. Joseph's failure to adopt and implement reasonable safeguards for the security of Plaintiff's and Class Members' PHI entrusted to it— both of which are violations of the Texas Hospital Licensing Law.  Plaintiff and Class Members, therefore, are entitled to injunctive relief and/or to recover their damages under TEX. HEALTH & SAFETY CODE § 241.156.

## COUNT V

## NEGLIGENCE/GROSS NEGLIGENCE

97.     The previous factual statements and allegations are incorporated by reference.

98.     Upon coming into possession of Plaintiff's and Class Members' private, non-public, and sensitive PII/PHI, St. Joseph had (and continues to have) a duty to exercise reasonable care in safeguarding and protecting the PII/PHI from being stolen and compromised. St. Joseph's duty arises from the common law, in part, because it was reasonably foreseeable to St. Joseph under the circumstances that a data breach in its computer system was likely to occur that would cause Plaintiff and Class Members to suffer the above-described harm and damages. St. Joseph's duty also arises from the PII/PHI security obligations expressly imposed upon St. Joseph from other sources, such as HIPAA, the Texas Medical Records Privacy Act, the Texas Medical Practice Act, Texas Hospital Licensing Law, Sections 521.052 and 521.053 of the Texas

Business and Commerce Code, industry standards, and/or its Privacy Notice in effect at the time of the data Breach.

99.     St. Joseph also had a duty to timely disclose to Plaintiff and Class Members about the Data Breach so Plaintiff and Class Members could take the appropriate defensive steps necessary to minimize their harm and damages.   Instead, by its above-described wrongful actions, inaction and/or omissions, and delayed disclosure of the Data Breach, St. Joseph shifted its notification obligation and expenses to Plaintiff and Class Members.   St. Joseph also (i) directly and/or proximately caused Plaintiff and Class Members to suffer the above-described harm and damages, (ii) saved the cost of implementing the proper patient data security measures, policies, procedures, protocols, and software and hardware systems, and (iii) wrongfully shifted the risk and expense of the Data Breach to Plaintiff and Class Members.   St. Joseph's duty to properly and timely disclose the Data Breach to Plaintiff and Class Members also arises from the same above-described sources.

100.     St. Joseph also had a duty to identify, implement, maintain and monitor the appropriate customer data security measures, policies, procedures, protocols, and software and hardware systems within its computer system and servers to prevent and detect data breaches and the unauthorized dissemination of Plaintiff's and Class Members' PII/PHI—including their PII/PHI stolen and compromised by the Data Breach.   Such duty also arises from the same above-described sources.

101.     St. Joseph, by and through its above-described negligent and/or grossly negligent actions, inaction, omissions and/or silence when it had a duty to speak, breached its duties to Plaintiff and Class Members by, *inter alia*, failing to identify, implement, maintain and monitor the appropriate data security measures, policies, procedures, protocols, and software and

hardware systems within its computer system and servers, and failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' private, non-public, sensitive PII/PHI within St. Joseph's possession, custody and control.

102.    St. Joseph, by and through its above-described negligent and/or grossly negligent actions, inaction, omissions and/or silence when it had a duty to speak, also breached its duties to Plaintiff and Class Members by failing to properly and timely notify them of the Data Breach so they could take the necessary defensive steps to minimize their harm and damages. But for St. Joseph's grossly negligent, negligent and/or wrongful breach of the duties it owed (and continues to owe) Plaintiff and Class Members, their private, non-public, sensitive PII/PHI would never have been stolen and compromised, the Data Breach would not have occurred, and Plaintiff and Class Members would not have incurred the harm and damages they have incurred.

103.    The Data Breach and the resulting above-described harm and damages suffered by Plaintiff and Class Members were reasonably foreseeable consequences of St. Joseph's negligence and/or gross negligence.

104.    The economic loss doctrine does not apply to bar Plaintiff's and Class Members' negligence and/or gross negligence claims because, *inter alia*, (i) St. Joseph is in the business of supplying information for the guidance of Plaintiff and Class Members regarding their health care and/or securing payment from Plaintiff and Class Members for the provision of health care services, and (ii) St. Joseph made the above-described negligent and/or grossly negligent misrepresentations regarding the data security "tools" it had in place and/or engaged in the above-described negligent and/or grossly negligent conduct.

105.    Adding to St. Joseph's negligence, gross negligence, and violations of HIPAA, the Texas Medical Records Privacy Act, the Texas Medical Practice Act, Texas Hospital

Licensing Law, Sections 521.052 and 521.053 of the Texas Business and Commerce Code, industry standards, and its Privacy Notice, is the fact that approximately 94% of all healthcare organizations in the United States have suffered data breaches in the last two (2) years.[19] This is publicly available knowledge St. Joseph knew, or should have known, which should have caused it to properly safeguard and protect Plaintiff's and Class Members' PII/PHI.

106.   As a direct and/or proximate result of St. Joseph's above-described wrongful actions, inaction and/or omissions and the resulting Data Breach, Plaintiff and Class Members are entitled to compensation for, *inter alia*, the (i) improper disclosure of their PII/PHI, (ii) lost benefit of their bargains, (iii) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, (iv) diminished value of the medical services they paid St. Joseph to provide, (v) value of their lost time and out-of-pocket expenses incurred to mitigate the identity theft, identity fraud and/or medical fraud pressed upon them (and/or to be pressed upon them) by the Data Breach (including, *inter alia*, the value of their lost time and out-of-pocket expenses that St. Joseph advised and encouraged them to incur to place "freezes" and "alerts" with the credit reporting agencies, close or modify financial accounts, and closely review and monitoring their credit reports and accounts for unauthorized activity), (vi) emotional distress from the theft and compromise of their PII/PHI, the identity theft, identity fraud and/or medical fraud experienced to date and to be experienced in the future, and (vii) the credible threat of real and impending future harm and damages from identity theft, identity fraud and/or medical fraud—as evidenced by the identity theft, identity fraud and/or medical fraud Plaintiff has already experienced.

---

[19] "Ponemon Study Reveals Ninety-Four Percent of Hospitals Surveyed Suffered Data Breaches," (Dec. 6, 2013), available at http://www2.idexpertscorp.com/press/ninety-four-percent-of-hospitals-surveyed-suffered-data-breaches/ (last visited March 27, 2014).

107.     St. Joseph's above-described wrongful actions, inaction and/or omissions and the resulting Data Breach constitute negligence and/or gross negligence at Texas common law.

## COUNT VI

## NEGLIGENCE *PER SE*

108.     The preceding statements and allegations are incorporated by reference.

109.     At all relevant times, St. Joseph's was required (and continues to be required) to comply with, *inter alia*, HIPAA, the Texas Medical Records Privacy Act, the Texas Medical Practice Act, Texas Hospital Licensing Law, Sections 521.052 and 521.053 of the Texas Business and Commerce Code, and other industry and internal data security standards requiring it to, *inter alia*, (i) identify, implement, maintain and monitor the appropriate data security measures, policies, procedures, protocols, and software and hardware systems in its computer system and servers, (ii) safeguard, protect, and not disclose Plaintiff's and Class Members' PII/PHI within St. Joseph's possession, custody and control to unauthorized parties, and (iii) notify Plaintiff and Class Members about the Data Breach as quickly as possible.  These statutes and standards establish the minimal duty of care owed by St. Joseph to Plaintiff and Class Members.

110.     By its above-described wrongful actions, inaction, omissions, the resulting Data Breach, and failure to timely notify Plaintiff and Class Members about the Data Breach, St. Joseph knowingly failed to comply with HIPAA, the Texas Medical Records Privacy Act, the Texas Medical Practice Act, Texas Hospital Licensing Law, Sections 521.052 and 521.053 of the Texas Business and Commerce Code, and other industry and internal data security standards. Had St. Joseph complied with such laws and standards during the relevant time period, the Data Breach would not have occurred, and the resulting harm and damages would not have been

37

inflicted on Plaintiff and Class Members.

111.    Plaintiff and Class Members are members of the class of persons intended to be protected by HIPAA, the Texas Medical Records Privacy Act, the Texas Medical Practice Act, Texas Hospital Licensing Law, Sections 521.052 and 521.053 of the Texas Business and Commerce Code, and other industry and internal data security standards.  The above-described harm and damages suffered by Plaintiff and Class Members as a direct and/or proximate result of the Data Breach—for which they are entitled to compensation—are the types of injuries and harm intended to be prevented by these laws and standards.   St. Joseph's above-described wrongful actions, inaction and/or omissions and the resulting Data Breach constitute negligence *per se* at Texas common law.

## COUNT VII

## BREACH OF CONTRACT

112.    The preceding factual statements and allegations are incorporated by reference.

113.    Plaintiff and Class Members, on the one hand, and St. Joseph, on the other hand, mutually intended to form and, in fact, formed and entered into valid and enforceable contracts arising from, and evidenced by, the Privacy Notice.  Such contracts governed the Parties' business relationships.

114.    Under the terms of such contracts, Plaintiff and Class Members promised to pay money to St. Joseph in exchange for the provision of health care services and the protection of their PII/PHI by St. Joseph.  St. Joseph's contractual obligation to safeguard and protect Plaintiff's and Class Members' PII/PHI is a material term of such contracts and continues in full force and effect.

115.    All conditions precedent to St. Joseph's liability under these contracts have been performed by Plaintiff and Class Members.  Plaintiff and Class Members performed all of their obligations under the contracts by paying St. Joseph for the health care services it provided to them.   St. Joseph, however, breached its contracts with Plaintiff and Class Members by knowingly, maliciously, fraudulently, willfully, wantonly, negligently and wrongfully failing to safeguard and protect their PII/PHI as set forth above.

116.    St. Joseph's above-described wrongful actions, inaction and/or omissions breached its contracts with Plaintiff and Class Members and directly and/or proximately caused Plaintiff and Class Members to suffer harm and damages in the form of, *inter alia*, the lost benefit of their bargains; to wit, they understood, agreed and expected that a portion of the price they paid to St. Joseph for the provision of health care services would be spent by St. Joseph to safeguard and protect their PII/PHI that was ultimately stolen and compromised in the Data Breach.  Although Plaintiff and Class Members paid for the protection of their PII/PHI, St. Joseph failed to do so, thereby resulting in its theft and dissemination to the world and Plaintiff's and Class Members' lost benefit of their bargains.   St. Joseph's above-described wrongful actions, inaction and/or omissions and the resulting Data breach constitute breach of contract at Texas common law—for which Plaintiff and Class Members are entitled to recover the lost benefit of their bargains.

## COUNT VIII

## BREACH OF IMPLIED CONTRACT

117.    The preceding factual statements and allegations are incorporated by reference.

118.    In the alternative, Plaintiff and Class Members, on the one hand, and St. Joseph, on the other hand, mutually intended to form and, in fact, formed and entered into valid and

enforceable implied contracts arising from, and evidenced by, the Parties' acts and conduct and the Privacy Notice.  Such implied contracts governed the Parties' business relationships and consist of obligations arising from the Parties' mutual agreement and intent to promise where such agreements and promises are not specifically expressed in words in other agreements, if any.

119.    Under the terms of such implied contracts, Plaintiff and Class Members promised to pay money to St. Joseph in exchange for the provision of health care services and the protection of their PII/PHI by St. Joseph.  St. Joseph's contractual obligation to safeguard and protect Plaintiff's and Class Members' PII/PHI is a material term of such implied contracts and continues in full force and effect.

120.    All conditions precedent to St. Joseph's liability under these implied contracts have been performed by Plaintiff and Class Members.  Plaintiff and Class Members performed all of their obligations under the implied contracts by paying St. Joseph for the health care services it provided to them.  St. Joseph, however, breached its contracts with Plaintiff and Class Members by knowingly, maliciously, fraudulently, willfully, wantonly, negligently and wrongfully failing to safeguard and protect their PII/PHI as set forth above.

121.    St. Joseph's above-described wrongful actions, inaction and/or omissions breached its implied contracts with Plaintiff and Class Members and directly and/or proximately caused them to suffer harm and damages in the form of, *inter alia*, the lost benefit of their bargains; to wit, they understood, agreed and expected that a portion of the price they paid to St. Joseph for the provision of health care services would be spent by St. Joseph to safeguard and protect their PII/PHI that was ultimately stolen and compromised in the Data Breach.  Although Plaintiff and Class Members paid for the protection of their PII/PHI, St. Joseph failed to do so,

thereby resulting in its theft and dissemination to the world and Plaintiff's and Class Members' lost benefit of their bargains.  St. Joseph's above-described wrongful actions, inaction and/or omissions constitute breach of implied contract at Texas common law—for which Plaintiff and Class Members are entitled to recover the lost benefit of their bargains.

**COUNT IX**

**VIOLATION OF THE TEXAS DECEPTIVE**
**TRADE PRACTICES-CONSUMER PROTECTION ACT**

122.    The preceding factual statements and allegations are incorporated by reference.

123.    Plaintiff and Class Members are "consumers" under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), under Section 17.45(4) of the Texas Business and Commerce Code, by purchasing health care services and PII/PHI protection services from St. Joseph.  St. Joseph is a "person" that may be sued under the DTPA, under Section 17.45(3) of the Texas Business and Commerce Code, for providing such services.

124.    Plaintiff, therefore, prospectively asserts that by its above-described wrongful actions, inaction and/or omissions and the resulting Data Breach, St. Joseph knowingly and intentionally violated Section 17.50(a)(3) of the Texas Business and Commerce Code by engaging in the above-described unconscionable actions and/or unconscionable course of action; to wit, failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' PII/PHI which, as a direct and/or proximate result, was stolen and compromised in the Data Breach.

125.    St. Joseph's above-described wrongful actions, inaction and/or omissions and the resulting Data Breach unfair took advantage of the lack of knowledge, ability, and experience of Plaintiff and Class Members to a grossly unfair degree regarding St. Joseph's computer system

41

and servers and St. Joseph's inability to safeguard and protect their PII/PHI; to wit, at the time Plaintiff and Class Members gave St. Joseph their PII/PHI in connection with purchasing health care services, Plaintiff and Class Members did not know, and had no way of knowing, that St. Joseph was incapable of safeguarding and protecting their PII/PHI.

126.    Concurrent with filing this Class Action Complaint, Plaintiff served a 60-day demand letter on St. Joseph under Section 17.505 of the Texas Business and Commerce Code. Should this matter not be resolved to the satisfaction of Plaintiff, on behalf of herself and all Class Members, within the 60-day period, Plaintiff intends to amend this Class Action Complaint and formally assert this cause of action.

## COUNT X

## <u>MONEY HAD AND RECEIVED/ASSUMPSIT</u>

127.    The preceding factual statements and allegations are incorporated by reference.

128.    Plaintiff pleads this Count in the alternative to its breach of contract claims because Plaintiff and Class Members cannot recover under this Count and under their breach of contract counts.

129.    By its above-described wrongful actions, inaction and/or omissions and the resulting Data Breach, St. Joseph holds money conferred on it by Plaintiff and Class Members— *i.e.*, that portion of the purchase price Plaintiff and Class Members paid St. Joseph for the provision of health care services that St. Joseph should have paid to safeguard and protect their PII/PHI that was ultimately stolen and compromised in the Data Breach—that in equity and good conscience, belongs to Plaintiff and Class Members and should be refunded because of St. Joseph's failure to do so.  St. Joseph was (and continues to be) unjustly enriched by such amounts.

130.     St. Joseph also continues to be unjustly enriched by, *inter alia*, (i) the saved cost of implementing the proper PII/PHI security measures, policies, procedures, protocols, and software and hardware systems in its computer system and servers, which it did not implement, (ii) the shifted risk and expense of the Data Breach to Plaintiff and Class Members, and (iii) the return on investment on all above-described amounts.

131.     St. Joseph, therefore, should be compelled to refund (or disgorge) such wrongfully collected, saved back and/or shifted funds and expenses under the common law equitable doctrine of money had and received and/or the duty to make restitution under the common law equitable doctrine of assumpsit.

## RELIEF REQUESTED

132.     The preceding factual statements and allegations are incorporated by reference.

133.     **ACTUAL, CONSEQUENTIAL DAMAGES AND/OR NOMINAL DAMAGES.**  As a direct and/or proximate result of St. Joseph's wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and Class Members have suffered (and continue to suffer) economic damages and other actual harm in the form of, *inter alia*, the (i) improper disclosure of their PII/PHI, (ii) statutory damages under FCRA, (iii) lost benefit of their bargains, (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, (v) diminished value of the medical services they paid St. Joseph to provide, (vi) value of their lost time and out-of-pocket expenses incurred to mitigate the identity theft, identity fraud and/or medical fraud pressed upon them (and/or to be pressed upon them) by the Data Breach (including, *inter alia*, the value of their lost time and out-of-pocket expenses that St. Joseph advised and encouraged them to incur to place "freezes" and "alerts" with the credit reporting agencies, close or modify financial accounts, and closely review and monitoring their credit

reports and accounts for unauthorized activity), (vii) emotional distress from the theft and compromise of their PII/PHI, the identity theft, identity fraud and/or medical fraud experienced to date and to be experienced in the future, and (viii) the credible threat of real and impending future harm and damages from identity theft, identity fraud and/or medical fraud—as evidenced by the identity theft, identity fraud and/or medical fraud Plaintiff has already experienced. Plaintiff's and Class Members' damages were foreseeable by St. Joseph and exceed the minimum jurisdictional limits of this Court.  All conditions precedent to Plaintiff's and Class Members' claims for relief have been performed and/or occurred.

134.   **EXEMPLARY DAMAGES.**   Plaintiff and Class Members also are entitled to exemplary damages as punishment and to deter such wrongful actions, inaction and/or omissions in the future.  All conditions precedent to Plaintiff's and Class Members' claims for relief have been performed and/or occurred.

135.   **DTPA TREBLE DAMAGES.**  Plaintiff prospectively asserts she and the Class Members are also entitled to treble their actual damages for St. Joseph's knowing, willful, intentional, wrongful and unconscionable conduct in violation of the Texas DTPA, under Section 17.50(b)(1) of the Texas Business and Commerce Code—which will be formally asserted by Plaintiff should Plaintiff's and Class Members' claims not be satisfactorily resolved within the next sixty (60) days.  All conditions precedent to Plaintiff's and Class Members' claims for relief have been performed and/or occurred.

136.   **INJUNCTIVE RELIEF.**  Plaintiff and Class Members also are entitled to injunctive relief requiring St. Joseph to, *inter alia*, (i) immediately disclose to Plaintiff and Class Members the precise nature, breadth, scope and extent of their stolen and compromised PII/PHI, including the specific information comprising the stolen "medical information," (ii) make prompt and

detailed disclosure to all past, present and future patients affected by any future data breaches of their PII/PHI, (iii) immediately encrypt the PII/PHI of its past, present, and future patients within its possession, custody and control, (iv) implement the above-referenced proactive policies and procedures in order to secure and protect its patients' PII/PHI and be in a position to immediately notify them about any data breaches, (v) submit to periodic compliance audits by a third party regarding the implementation of and compliance with such policies and procedures, and (vi) submit to periodic compliance audits by a third party regarding the security of its patients' PII/PHI within its possession, custody and control.  All conditions precedent to Plaintiff's and Class Members' claims for relief have been performed and/or occurred.

137.  **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.**  Plaintiff and Class Members also are entitled to recover their attorneys' fees, litigation expenses and court costs in prosecuting this action pursuant to, *inter alia*, (i) 15 U.S.C. §§ 1681n(a); o(a), (ii) Chapter 38 of the Texas Civil Practice and remedies Code, and (iii) Section 17.50(d) of the Texas Business and Commerce Code.  All conditions precedent to Plaintiff's and Class Members' claims for relief have been performed and/or occurred.

**WHEREFORE,** Plaintiff, on behalf of herself and Class Members, respectfully requests that (i) St. Joseph be cited to appear and answer this lawsuit, (ii) this action be certified as a class action, (iii) Plaintiff be designated the Class Representative, and (iv) Plaintiff's counsel be appointed as Class Counsel.  Plaintiff, on behalf of herself and Class Members, further requests that upon final trial or hearing, judgment be awarded against St. Joseph, in favor of Plaintiff and the Class Members, for:

    (i)    actual damages, consequential damages. nominal damages, and/or FCRA statutory damages (as described above) in an amount to be determined by the trier of fact;

    (ii)    exemplary damages:

(iii)    treble damages as set forth above;

(iv)    injunctive relief as set forth above;

(v)    pre- and post-judgment interest at the highest applicable legal rates;

(vi)    attorneys' fees and litigation expenses incurred through trial and any appeals;

(vii)    costs of suit; and

(viii)    such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of herself and all others similarly situated, respectfully demands a trial by jury on all of her claims and causes of action so triable.

Date:  March 29, 2014

Respectfully submitted,

/s/  Richard L. Coffman
Richard L. Coffman
**THE COFFMAN LAW FIRM**
505 Orleans St., Ste. 505
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Mitchell A. Toups
**WELLER, GREEN, TOUPS & TERRELL, LLP**
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com

Jason Webster
**THE WEBSTER LAW FIRM**
6200 Savoy, Suite 515
Houston, TX 77036
Telephone: (713) 581-3900
Facsimile: (713) 409-6464
Email: jwebster@thewebsterlawfirm.com